EDITH M. GERLACH, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4876-68.    Filed October 28, 1970.

*J. D. Hartwig,* for the petitioner.
*Patrick R. McKenzie,* for the respondent.

SCOTT, *Judge:* Respondent determined a deficiency in petitioner's income tax for the calendar year 1966 in the amount of $1,458.96. The only issue for decision is whether $10,000 received by petitioner from

her former husband is includable in her taxable income under section 71(a)(1) and (c)(2) of the Internal Revenue Code of 1954.[1]

Some of the facts have been stipulated and are found accordingly.

Petitioner resided in Stevensville, Mich., at the time of the filing of the petition in this case. She filed her Federal income tax return for the calendar year 1966 with the district director of internal revenue in Detroit, Mich. In October 1947 petitioner was married to Norman Gerlach (hereinafter referred to as Norman). At the time she was employed by Indiana-Michigan Electric Co. doing general office work and accounting and Norman was operating a sole proprietorship under the name of Gerlach Floor Covering Co. Upon her marriage, petitioner resigned from the position she then held and began keeping the books of her husband's business. In 1953 Norman sold Gerlach Floor Covering Co. and purchased 10 acres of land, title to which was taken in his and petitioner's names as joint tenants. The land was purchased for the purpose of starting a mobile home park which was to be operated in partnership with an individual by the name of Schmuhl. Petitioner did some of the bookkeeping and wrote some of the checks with respect to the trailer park business. Before the park was developed Norman sold his interest in it to Schmuhl. The 10 acres of land which had been purchased in 1953 were conveyed by petitioner and Norman to Empire Mobile Home Park, Inc., by deed dated August 30, 1957. After Norman's interest in the trailer park business was transferred to Schmuhl, petitioner borrowed $3,000 from her father which was used as part of the fund to begin a trailer sales business under the name of Gerlach Trailer Sales, Inc. Norman repaid the $3,000 to petitioner's father shortly before the institution of the divorce proceedings between him and petitioner.

Sometime prior to 1962 while petitioner and Norman were on a vacation trip in Florida, they began playing a game called Aggravation. They brought this game back to Michigan with them and began playing it with their friends. Petitioner, Norman, and some of their friends decided to form a partnership to undertake the manufacture and distribution of the game Aggravation. A partnership was formed by five couples with both the husbands and wives becoming partners. A formal partnership agreement was entered into on June 1, 1962, naming each husband and each wife, including petitioner and Norman, as an equal partner. The agreement provided that each partner should share equally in the expenses of initiating, maintaining, and operating the partnership and should share equally in their time expended for the benefit of the partnership. The agreement also provided that each of the 10 partners should share equally in the earnings

---

[1] All references are to the Internal Revenue Code of 1954 unless otherwise indicated.

of the partnership or the losses incurred by the business and should have equal rights in the management of the business. The agreement provided that the business should be known as the CO-5 Co. The partners invested money in the venture in amounts ranging from $5 to $50 a week dependent on the needs of the business. At first the partnership used a garage in which to manufacture the game. Later the partnership rented a building in which to manufacture the game. The amounts put into the partnership business by petitioner and Norman were taken from their joint bank account. Petitioner kept notes for the partnership business. She also wrote letters to suppliers and helped in the manufacture and packaging of the game, as did the other partners. Norman continued the trailer sales business and petitioner continued to work with him in that business. At some time prior to April 1963, the partnership business was incorporated under the name of CO-5 Co., Inc., and stock was issued to each of the couples as joint tenants with right of survivorship. On April 9, 1963, a certificate for 400 shares of CO-5 Co., Inc., stock was issued to petitioner and Norman as joint tenants. Later three of the couples sold their stock to the CO-5 Co. At that time there were 5,000 shares of stock outstanding. After the three couples withdrew from the business in mid-1963, 1,800 shares of stock were held by petitioner and Norman in their names as joint tenants and 900 shares were held by Norman Gerlach in his name as an individual. The 900 shares had originally been issued on May 15, 1964, to Norman Gerlach and Clifford Gerlach, the son of Norman and petitioner, as joint tenants. However, Norman was informed that the name of his minor son would have to be removed from the certificate if the corporation was to report its income under subchapter S of the Internal Revenue Code and the original certificate was canceled, and a certificate also dated May 15, 1964, issued in Norman's name. The 2,300 shares of CO-5 Co. stock which were not owned by petitioner and Norman were owned by a couple by the name of Bush. This couple was among the original group of partners and when three couples withdrew from the business, they acquired the stock of those couples which was not acquired by the Gerlachs.

In October 1964, petitioner filed an action for divorce against Norman in the Circuit Court of Berrien County, Mich. The complaint asked for temporary alimony of $100 per week for petitioner and an order granting such alimony was entered. After the original complaint was filed petitioner and her attorney requested an increase in the temporary alimony from $100 to $150 per week because of obtaining more accurate information as to Norman's income. That request was granted by the court. Between the time the complaint seeking the divorce was filed in October of 1964, and the time of the hearing on the complaint,

petitioner's attorney and Norman's attorney negotiated with respect to a property settlement and alimony agreement to be entered into by the parties. At the time petitioner did not know the value of the realty held by her husband nor of the stock of Trailer Sales, Inc., nor of the house and furnishings nor of the CO–5 Co., Inc., stock. During the negotiations petitioner's attorney attempted to acquire for petitioner as close to one-half the property which she and Norman owned, as possible. Several letters were exchanged between the attorneys and in each of the letters written by petitioner's attorney he stated petitioner's position to be that she had worked along with her husband in the various businesses during their married life and one-half of all their property was hers. In each letter the CO–5 Co. stock was specifically referred to with petitioner's position being stated to be that one-half of this stock was hers. In one letter dated March 11, 1966, petitioner's attorney proposed the following property settlement on behalf of petitioner:

1. Mrs. Gerlach get the home and adjoining property, free and clear from any mortgage or liens whatsoever;

2. Mrs. Gerlach have one-half of the stock in CO–5, giving Mr. Gerlach an irrevocable power of attorney to vote the stock to the best interests of the corporation and Mrs. Gerlach. This should be combined with an agreement in the nature of a buy and sell agreement that in the event either party should want to sell their stock to a third party, the other party would have an option to purchase the stock at the same price as the highest firm bid of a third party.

3. $100.00 per week alimony to Mrs. Gerlach so long as she remains single.

In consideration of this, Mr. Gerlach to have the following:

1. Trailer Sales copartnership free and clear of any claim from Mrs. Gerlach.

2. His one-half interest in the 15 acres of land free and clear of any claim by her.

3. Control of management of CO–5.

During the negotiations petitioner received sometime in 1965 an appraisal of a value of $120,000 for one-half of the 2,700 shares of CO–5 stock owned by the Gerlachs. Norman's attorney got an appraisal of $30,000 to $35,000 as a reasonable payment to petitioner for 1,350 shares of CO–5 Co. stock which amount made reductions from an otherwise appraised value for certain uncertainties.

Trial was set on the divorce hearing for March 16, 1966. Just prior to the date set for the trial petitioner's attorneys and Norman's attorneys agreed that the case would be settled on the basis of a stipulated property settlement agreement. Such an agreement was drafted by Norman's attorney and given to petitioner's attorney outside the courtroom on the day of the trial. Petitioner's attorney refused to sign the agreement because of certain objections he had to certain statements therein but agreed to stipulate in open court as to the basic terms of the agreement between the parties. The following is a portion of the

transcript of the hearing in the Circuit Court of Berrien held on March 16, 1966:

Mr. SEYMOUR. [attorney for petitioner] May it please the court, as a result of this case having been set for trial this morning as a contested matter, we have worked out a settlement, including a property settlement which we will present to the court and then I understand that the defendant has agreed to withdraw his answer to the complaint and his cross-complaint and consent to the plaintiff proceeding as on default to take a judgment of divorce and property settlement which has been agreed upon except as to details.

Basically the property settlement is as follows:

Plaintiff is to have for her own separate property the home of the parties, subject to the existing mortgage, which she assumes and agrees to pay, and hold him harmless.

Two: Plaintiff is to have as her own separate property all furniture and personal possessions, property and effects presently in her possession, free of and clear of any demand by the defendant, and also includes a car which is presently in her name, on which there is a mortgage which he will assign and from which she will save him harmless.

The plaintiff, in addition to that shall have alimony in the amount of $100 per week commencing as of next Friday.

By way of property settlement and division of property between the parties, the defendant shall pay to the plaintiff the sum of $125,000, to be paid in installments of $10,000 per year without interest, and there shall be a down payment upon entry of judgment in the amount of $5,000. The balance in the amount of $120,000 shall be paid at the rate of $10,000 per year. Payments to be quarterly, commencing September 1st of 1966. Thereafter yearly payments shall be paid in the amount of $10,000 quarterly each year. Thereafter payment to be made on March 1st, June 1st, September 1st and December 1st of each year.

To secure these payments it is agreed that defendant will place the stock in escrow with the corporate escrow agent under provisions to be worked out in detail by the attorney, that is, myself and Mr. Keller.

The COURT. That is for security?

Mr. SEYMOUR. To secure payment of the property settlement payment of $125,000.

In consideration of this payment by the defendant to the plaintiff, the plaintiff shall have as his free and separate property all personal effects he now has in his possession. He shall also have as his own personal property and clear of any claim by the defendant a certain 13-acre parcel of land located in Benton Township, which will be described in the property settlement agreement. He shall also have as his own separate property the stock in the company known as CO-5 Company, Inc., in which stock is presently owned jointly by husband and wife. She will convey to him her interest in that. In addition he shall have free and clear from any claims by the plaintiff the interest in what is known as Gerlach's Trailer Sales, a co-partnership located in the Township of Benton. She will convey to him any interest she may have in that, and there shall be the usual dower provision in that he shall hold his remaining land free and clear of any claim on behalf of the plaintiff.

I think that that is the essence of the property settlement agreement. Details of it shall be worked out by the attorneys and will be submitted to the court at the time a judgment of divorce is submitted.

Of course the judgment shall provide the usual insurance agreement in addition to that.

Mr. KELLER. [Norman's attorney] Just a moment, Your Honor. Basically Mr. Seymour has read from a proposed property settlement that I have prepared on this date, and if it's agreeable with counsel perhaps both parties could sign at this time the proposed property settlement and we could file it.

Mr. SEYMOUR. I submitted it to the court as we agreed in chambers, the basic property settlement, the details of which have to be worked out, but I cannot sign this because I have only read it over once and it has details in it that aren't correct, and it was agreed, as I understand, that we would put the basic property settlement on record and then—.

The COURT. There was some mention made in chambers of a trustee escrow agent or trustee.

Mr. SEYMOUR. Yes.

The COURT. It was suggested that F & M Bank was the one, is that correct?

Mr. SEYMOUR. That was the suggestion. It makes no difference to me.

Mr. KELLER. That's agreeable with the defendant, Your Honor.

Mr. SEYMOUR. It's agreeable with me that they be the escrow agent.

The COURT. Anything else?

Mr. KELLER. Well, Your Honor, so there won't be any question, I would assume Mr. Seymour that this was your only objection to the format that we have prepared for the court at this time? That would be the reference to the security agreement?

Mr. SEYMOUR. Well, I believe there were other details in which changes are to be made. For instance, provisions as to the terms of default.

Mr. KELLER. I will be agreeable, Your Honor, to putting all these objections on the record and then committing your present understanding so that there won't be any future problem.

The COURT. I would think that you should agree that in the event of default what the results should be and how long the default would have to be. I think you could do that now, and the phraseology could be easily determined later.

Mr. SEYMOUR. Yes. The agreement is if the payment shall be in default for 90 days then security may be foreclosed pursuant to the security agreement, and the defaulted payment shall bear interest at 7%.

The COURT. Is that satisfactory?

Mr. KELLER. That is satisfactory, Your Honor. And again I would like to renew my motion that the parties sign at this time, with that one exception.

The COURT. I don't think it's necessary for them to sign as long as you get the agreement in the record, and if the judgment cannot be agreed upon on those terms the court will be willing to settle it, to determine that feature, as long as there is agreement to the default feature. I don't see anything else that is going to be of importance.

Mr. KELLER. Mr. Seymour, is there any other area in which the proposed property settlement is not in accord with your understanding?

Mr. SEYMOUR. Not in essence, no, but in detail, yes. That's all I said, in detail. The essence of the agreement I will agree.

The COURT. The essence of the agreement with that default provision seems to me to be complete enough so that the court—I don't see how counsel could fail to agree except if there was bad faith involved. I feel that the court could take care of it if there were. I can't think of anything else that is involved. It takes care of all the property, as I understand it, that these parties own. Is that correct?

Mr. SEYMOUR. Yes, sir. All the property that we know of, yes, sir.

The COURT. Well, is there any doubt about any other property?

Mr. SEYMOUR. Not to my knowledge, Your Honor.

The COURT. Some of the details in regard to the partnership would be ironed out without changing the general aspect of it, the modus operandi for getting it completed. For instance, a bill of sale, I guess, or agreement that there would be a proper accounting, and that there was nothing more to account, and that type thing.

Mr. SEYMOUR. In that respect we will give the necessary papers to release whatever interest she may have in the partnership.

The COURT. Yes, I don't think there is anything that you could disagree on of importance. I don't see any reason why there should be any signatures affixed to it as long as counsel has agreed to it, and when you get through I will make the proper inquiry of parties so you will have them on record also.

*     *     *     *     *     *     *

Mr. KELLER. Your Honor, the property settlement and alimony provisions and insurance provisions as enumerated and gone over at length by Mr. Seymour is basically correct. This is the understanding of our stipulation, that the agreement will be in the following form:

That the plaintiff will receive in lieu of dower and as her property settlement, the home, personal effects and furniture, and that the defendant will receive the shares of stock in the trailer sales, his personal effects; that she will then release the dower and that in consideration of the discharge of support and termination of this marriage the plaintiff will receive $100 weekly alimony, which she will also receive a principal sum of $125,000, payable in installments as we have proposed and this principal sum will be secured by the escrow agreement illuminated by counsel.

*     *     *     *     *     *     *

The COURT. Let me ask you another question here. It hasn't been mentioned. Is this alimony of $100 a week to continue until the death of the plaintiff?

Mr. SEYMOUR. Or remarriage.

Mr. KELLER. Yes.

The COURT. Mrs. Gerlach, have you heard what has gone on between your husband's counsel and your own counsel?

Mrs. GERLACH. Yes.

The COURT. Are you satisfied with that financial agreement?

Mrs. GERLACH. I agree with the property settlement, yes.

The COURT. All right, Mr. Gerlach, do you agree to that?

Mr. GERLACH. I do.

Following this stipulation in open court Norman's attorney drafted a property settlement agreement which was not signed or agreed to by petitioner or her attorney. However, the judgment of divorce filed on April 15, 1966, by the Circuit Court of Berrien County contained the provisions which were in the draft made by Norman's attorney including the following:

PROPERTY SETTLEMENT AND PROVISION IN LIEU OF DOWER

IT IS FURTHER ORDERED AND ADJUDGED, that the said Plaintiff, Edith Gerlach, shall have and hold the following described property free and clear of any and all demands of Defendant, Norman Gerlach, and Plaintiff, Edith Gerlach, shall assume, pay, and hold Defendant, Norman Gerlach, harmless from the out-

standing balance on the existing mortgage of said premises to the Peoples Savings Association of Benton Harbor, said premises located in the Township of Sodus, County of Berrien, State of Michigan, and described as follows:

\*      \*      \*      \*      \*      \*      \*

AND IT IS FURTHER ORDERED, that the Plaintiff, Edith Gerlach, shall have and hold as her separate and sole property all furniture, equipment, and personal effects presently in her possession, including a 1965 Ford automobile registered in Plaintiff's name, free and clear of any and all claims or demands on behalf of Defendant, Norman Gerlach, and Plaintiff, Edith Gerlach, shall assume, discharge and hold Defendant harmless from any outstanding obligation in connection with the foregoing property awarded to Plaintiff, Edith Gerlach.

AND IT IS FURTHER ORDERED, that the Defendant, Norman Gerlach, shall have and hold the following described property free and clear of any and all demands or claims of Plaintiff, Edith Gerlach, and Defendant, Norman Gerlach, shall assume, discharge and hold Plaintiff harmless from any obligation in connection with the following described property, to-wit:

a. 2700 Shares of CO-5 Company, Inc. heretofore registered either in the names of Plaintiff and Defendant jointly, or in the name of Defendant individually, subject only to a security agreement hereinafter described.

b. The Gerlach Trailer Sales.

c. Real Estate located in the Township of Benton, County of Berrien, State of Michigan, and described as follows, to-wit:

\*      \*      \*      \*      \*      \*      \*

d. A 1964 Lincoln Continental automobile registered in Defendant's name.

e. All personal effects presently in Defendant's possession.

AND IT IS FURTHER ORDERED AND ADJUDGED, that the provisions of the said property settlement for Plaintiff, Edith Gerlach, shall be in lieu of her dower in the lands of her husband, Norman Gerlach, and he shall hereafter hold his remaining lands free, clear and discharged from any such dower right or claim and said provision shall also be in full satisfaction of all claims Plaintiff, Edith Gerlach, might have in any property which the Defendant, Norman Gerlach, owns or may hereafter own, or in which he had or may hereafter have any interest.

## ALIMONY

AND IT IS FURTHER ORDERED AND ADJUDGED, that Defendant, Norman Gerlach, shall pay the amount of One Hundred ($100.00) Dollars weekly commencing March 18, 1966, said weekly obligation to terminate either upon the death or the re-marriage of Plaintiff; and

IT IS FURTHER ORDERED AND ADJUDGED, that Defendant, Norman Gerlach, shall pay the principal sum of One Hundred Twenty-Five Thousand ($125,000.00) Dollars evidenced by a promissory note and payable in installments of Ten Thousand ($10,000.00) Dollars per annum, without interest, and that said payment shall become due and payable as follows:

a. Five Thousand ($5,000.00) Dollars to be paid upon the entry of judgment of divorce; Two Thousand Five Hundred ($2,500.00) Dollars on September 1, 1966; Two Thousand Five Hundred ($2,500.00) Dollars on December 1, 1966;

b. Thereafter the yearly amount shall become payable in quarterly payments on March 1, June 1, September 1, and December 1, of each and every year thereafter until said sum is paid in full.

PROVIDED, that in the event the annual earnings of CO-5 Company, Inc. stock now or hereafter held by Defendant, Norman Gerlach, shall be less than

Ten Thousand ($10,000.00) for the fiscal year of said corporation, then the annual installment for that calendar year in which said fiscal year shall end shall be adjusted to an amount equivalent to said net earnings or to the sum of Five Thousand ($5,000.00) Dollars, whichever sum is greater. For the purpose of computing said annual earnings, the corporation shall be treated and considered as a corporation taxed as a partnership under subchapter S of the 1954 Internal Revenue Code and that Defendant, Norman Gerlach's, gross annual salary shall be assumed to not exceed Twenty Five Thousand ($25,000.00) Dollars.

IT IS FURTHER ORDERED AND ADJUDGED, that the principal sum of One Hundred Twenty-Five Thousand ($125,000.00) Dollars shall be secured by an escrow agreement and a promissory note, a copy of which is attached hereto and by reference incorporated and made a part of this judgment.

The judgment of divorce filed in the court on April 15, 1966, recited it was a judgment of divorce at a session of said court held March 17, 1966, and that the divorce was granted on motion of attorneys for the plaintiff. The judgment was signed by the judge of the Circuit Court, countersigned by a deputy clerk and approved as to form and content by Norman's attorney. There is no indication on the document of approval or disapproval by petitioner's attorney.

The escrow agreement attached to the judgment provided for the deposit by Norman of 2,700 shares of common stock of CO-5 Co. with a designated bank as security for payment of the $125,000, evidenced by a note of which Norman was the maker and petitioner was the payee. The assignment reserved the right of Norman to sell or otherwise transfer his interest in the stock and to substitute Government bonds of equal value for the stock or other property by agreement of the parties. It specifically reserved Norman's right to vote the stock and provided for release of the stock to Norman when the note had been paid or upon substitution of other property. The note given by Norman to petitioner recited that it was secured by 2,700 shares of common stock of CO-5 Co.

In November 1966 the shareholders of CO-5 Co. were offered a total of $513,500 for their interest in the corporation made up of $200,000 for their stock, $150,000 to be paid to Norman for a noncompete agreement and $120,500 for a consultant agreement, both agreements to run over a period of 15 years, and $43,000 to be paid to Bush for a noncompete agreement together with an insurance policy on the life of Norman payable to his estate, premiums on which were to be paid by the offeror. No sale was made pursuant to this offer.

On February 9, 1968, the Bushes who owned 2,300 shares of CO-5 Co. stock sold that stock to CO-5 Co. for the sum of $239,000 payable $69,000 in cash on the execution of the agreement of sale and the balance by promissory note bearing interest at the rate of 4 percent per annum. The note was due on or before April 1, 1973. The note

was paid in full on December 1, 1969. In 1969 Norman who then owned all of the outstanding stock of the CO–5 Co. sold his stock in that company for $581,000.

Petitioner on her Federal income tax return for the calendar year 1966 reported alimony income of $5,200 and reported the following with respect to CO–5 Co. stock in the portion of Schedule D dealing with "Long-term capital gains and losses—assets held more than 6 months":

| a. Kind of property and how acquired | b. Date acquired (mo., day, yr.) | c. Date sold (mo., day, yr.) | d. Gross sales price | e. * * * | f. Cost or other basis | g. Gain or loss |
|---|---|---|---|---|---|---|
| CO–5 Co. Inc., common stock___ { | 4/ 1/63 5/15/64 | 3/17/66 | $94, 486 | _____ | $8, 376 | $86, 110 |
| Gross profit percentage on above installment sale 91.1352%, 1966 collections $7,559×91.1352%=_____ | | | | | | 6, 889 |

Petitioner also reported as other interest an amount of $2,441 which was listed as received from Norman.

Respondent in his notice of deficiency increased the ordinary income as reported by petitioner on her 1966 return by $10,000 and decreased her income by the amount of $3,444.50 reported as capital gain and the amount of $2,441 reported as interest income with the following explanation:

It is determined that the amount of $10,000 which you received from your former husband, Norman Gerlach, pursuant to a divorce decree did not arise from a sale of corporate stock by you to Norman, and its does not qualify as an excludable installment payment since the payments are to be paid to you over a period ending more than ten years from the date of the decree. On your return you treated his payment as a long-term capital gain in the net amount of $3,444.50 and as a payment of interest in the amount of $2,441.00. Accordingly, taxable income has been adjusted as shown above.

In her petition petitioner alleged that she erroneously reported the receipt of the sum of $10,000 as payment of imputed interest in the amount of $2,441 and long-term capital gain to the extent of 91.1352 percent of the balance as an installment sale, whereas, in fact, no part of the $10,000 was taxable. In her prayer for relief she asked that the Court determine that she had overpaid her tax liability for the year 1966 by the amount of $1,474.07. Respondent in his answer denied petitioner's allegation with respect to her erroneous reporting of the $10,000 and also denied that petitioner was entitled to the relief claimed in her prayer.

### OPINION

Section 71(a) provides for the inclusion in the income of a divorced wife of periodic payments which are received in discharge of a legal obligation which, because of the marital or family relationship is

imposed on her husband under the decree of divorce. Section 71(c)[2] provides that installment payments discharging an obligation the principal sum of which is specified in the decree shall not be treated as periodic payments except when by the terms of the decree the installments are payable over a period ending more than 10 years from the date of the decree. In the instant case we have the principal sum of $125,000 which by the terms of the decree was payable over a period of 12½ years. However, petitioner contends that the $125,000 principal sum required to be paid to her by the decree is not in discharge of a legal obligation which was imposed on or incurred by Norman because of the marital or family relationship but rather was a payment resulting from the division of property which she and Norman owned jointly.

Respondent's regulations, sec. 1.71–1(c)(4), Income Tax Regs,[3] recognize that payments made to a wife which are attributable to an

---

[2] SEC. 71. ALIMONY AND SEPARATE MAINTENANCE PAYMENTS.

(a) GENERAL RULE.—

(1) DECREE OF DIVORCE OR SEPARATE MAINTENANCE.—If a wife is divorced or legally separated from her husband under a decree of divorce or of separate maintenance, the wife's gross income includes periodic payments (whether or not made at regular intervals) received after such decree in discharge of (or attributable to property transferred, in trust or otherwise, in discharge of) a legal obligation which, because of the marital or family relationship, is imposed on or incurred by the husband under the decree or under a written instrument incident to such divorce or separation.

(2) WRITTEN SEPARATION AGREEMENT.—If a wife is separated from her husband and there is a written separation agreement executed after the date of the enactment of this title, the wife's gross income includes periodic payments (whether or not made at regular intervals) received after such agreement is executed which are made under such agreement and because of the marital or family relationship (or which are attributable to property transferred, in trust or otherwise, under such agreement and because of such relationship). This paragraph shall not apply if the husband and wife make a single return jointly.

(3) DECREE FOR SUPPORT.—If a wife is separated from her husband, the wife's gross income includes periodic payments (whether or not made at regular intervals) received by her after the date of the enactment of this title from her husband under a decree entered after March 1, 1954, requiring the husband to make the payments for her support or maintenance. This paragraph shall not apply if the husband and wife make a single return jointly.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(c) PRINCIPAL SUM PAID IN INSTALLMENTS.—

(1) GENERAL RULE.—For purposes of subsection (a), installment payments discharging a part of an obligation the principal sum of which is, either in terms of money or property, specified in the decree, instrument, or agreement shall not be treated as periodic payments.

(2) WHERE PERIOD FOR PAYMENT IS MORE THAN 10 YEARS.—If, by the terms of the decree, instrument, or agreement, the principal sum referred to in paragraph (1) is to be paid or may be paid over a period ending more than 10 years from the date of such decree, instrument, or agreement, then (notwithstanding paragraph (1)) the installment payments shall be treated as periodic payments for purposes of subsection (a), but (in the case of any one taxable year of the wife) only to the extent of 10 percent of the principal sum. For purposes of the preceding sentence, the part of any principal sum which is allocable to a period after the taxable year of the wife in which it is received shall be treated as an installment payment for the taxable year in which it is received.

[3] Sec. 1.71–1. Alimony and separate maintenance payments; income to wife or former wife.

(a) In general. Section 71 provides rules for treatment in certain cases of payments in the nature of or in lieu of alimony or an allowance for support as between spouses who are divorced or separated. For convenience, the payee spouse will hereafter in this

interest in property which originally belonged to her are not income under section 71(a). In a number of cases we have pointed out that payment to a wife of an amount in settlement of an interest she owned in property is not a payment of a legal obligation which is imposed on or incurred by the husband because of the marital and family relationship. See *Wilma Thompson*, 50 T.C. 522, 525 (1968), and cases there cited. The cases are also uniform in holding that the terminology used in the decree particularly where the language is equivocal is not determinative of the nature of the payment. *Ann Hairston Ryker*, 33 T.C. 924 (1960), and *Wilma Thompson, supra*. Whether the payment is in the nature of support payments for the wife which the husband incurs because of the marital relationship or a payment because of her ownership in the property which she and her husband had acquired must be determined from all the surrounding facts and circumstances.

The judgment of divorce here involved contained certain provisions under the heading "Property Settlement and Provision in Lieu of Dower" and other provisions including that for payment of the principal sum of $125,000 under the heading of "Alimony." The disposition of the stock of CO-5 Co., Inc., is contained under the heading of "Property Settlement" with a reference made to a security agreement which is part of the provisions relating to the payment of the principal sum of $125,000 which are under the heading of "Alimony."

---

section be referred to as the "wife" and the spouse from whom she is divorced or separated as the "husband." See section 7701(a)(17). For rules relative to the deduction by the husband of periodic payments not attributable to transferred property, see section 215 and the regulations thereunder. For rules relative to the taxable status of income of an estate or trust in case of divorce, etc., see sections 682 and the regulations thereunder.

  * * * * * * *

(c) Alimony and separate maintenance payments attributable to property. * * *
 * * * * * * *

(4) Section 71(a)(1) or (2) does not apply to that part of any periodic payment attributable to that portion of any interest in property transferred in discharge of the husband's obligation under the decree or instrument incident to the divorce status or legal separation status, or transferred pursuant to the written separation agreement, which interest originally belonged to the wife. It will apply, however, if she received such interest from her husband in contemplation of or as an incident to the divorce or separation without adequate and full consideration in money or money's worth, other than the release of the husband or his property from marital obligations. An example of the first rule is a case where the husband and wife transfer securities, which were owned by them jointly, in trust to pay an annuity to the wife. In this case, the full amount of that part of the annuity received by the wife attributable to the husband's interest in the securities transferred in discharge of his obligation under the decree, or instrument incident to the divorce status or legal separation status, or transferred under the written separation agreement, is taxable to her under section 71(a)(1) or (2), while that portion of the annuity attributable to the wife's interest in the securities so transferred is taxable to her only to the extent it is out of trust income as provided in part I (sections 641 and following), subchapter J, chapter 1 of the Code. If, however, the husband's transfer to his wife is made before such property is transferred in discharge of his obligation under the decree or written instrument, or pursuant to the separation agreement in an attempt to avoid the application of section 71(a)(1) or (2) to part of such payments received by his wife, such transfers will be considered as a part of the same transfer by the husband of his property in discharge of his obligation or pursuant to such agreement. In such a case, section 71(a)(1) or (2) will be applied to the full amount received by the wife. As to periodic payments received under a joint purchase of a commercial annuity contract, see section 72 and the regulations thereunder.

The language of the decree is ambiguous but read as a whole indicates to us that the $125,000 is in payment of petitioner's interest in the CO–5 Co. stock. This is indicated not only by the provision that this stock be put up as security for the payment of the $125,000 but also by the fact that if the earnings of the CO–5 Co. stock held by Norman were less than $10,000 in any 1 year after allowing for a salary payment by CO–5 Co. to Norman of $25,000, the payment on the $125,000 due petitioner was to be reduced for that year to the earnings of the stock or $5,000 whichever is greater. If the $125,000 payment were not directly related to Norman's being granted all the CO–5 Co. stock, there would be no basis for this provision.

The fact that petitioner was a joint owner of record of 1,800 shares of the CO–5 Co. stock and claimed to be equitably a joint owner of the 900 shares registered in Norman's name leads to the conclusion that she would not transfer that stock to Norman without consideration other than the division of the other property which she and Norman owned. Also, the correspondence between the attorney for petitioner in the divorce action and the attorney for Norman in that action indicates that the payment of the principal sum was in satisfaction of the petitioner's claimed property rights in the CO–5 Co. stock rather than to provide for her support and maintenance. Moreover, the transcript of the stipulation in open court, while not totally clear, indicates that petitioner's attorney anticipated the payment of the principal sum as property settlement rather than a support payment and the language used by the attorney representing Norman is at best ambiguous.[4] Furthermore, the amount of $125,000 is not out of line with a reasonable value for 1,350 shares of CO–5 Co. stock as of the date of the divorce decree.

Respondent argues that the language of the decree is clear that the $125,000 was a payment imposed on Norman because of the marital relationship and that on the basis of the rationale of *Commissioner* v. *Danielson*, 378 F. 2d 771 (C.A. 3, 1967), reversing 44 T.C. 549, we should look to no other facts to determine the nature of the payment. The taxpayer in the *Danielson* case contended that an amount received under a contract providing that a portion of the payment was for a covenant not to compete was in fact all the purchase price of the business. The appeals court held that where the agreement allocating a

---

[4] The choice of phrasing used by Norman's lawyer in the following statement to the Court makes it virtually impossible to infuse any definitive meaning into the statement as it concerns the $125,000 principal sum:

"Mr. KELLER. That the plaintiff will receive in lieu of dower and as her property settlement, the home, personal effects and furniture, and that the defendant will receive the shares of stock in the trailer sales, his personal effects; that she will then release the dower and that in consideration of the discharge of support and termination of this marriage the plaintiff will receive $100 weekly alimony, which she will also receive a principal sum of $125,000, payable in installments as we have proposed and this principal sum will be secured by the escrow agreement illuminated by counsel."

purchase price between a covenant not to compete and other assets is clear, a party thereto may have it otherwise treated for Federal tax purposes only "by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc." This Court in *J. Leonard Schmitz*, 51 T.C. 306, 316 (1968), on appeal (C.A. 9, Mar. 18, 1969), did not accept the holding of the circuit court in *Danielson* but held upon "strong proof" of such an intent an amount allocated in a contract to a covenant not to compete might be considered as part of the purchase price of other assets so that to the extent the total price exceeded the taxpayer's basis in those assets capital gain resulted.

The *Danielson* and *Schmitz* cases both dealt with contracts entered into between a buyer and seller stating the portion of the price which was to be allocated to the various assets purchased. The factual situation in those cases is so different from the factual situation surrounding the entry of a decree of divorce by a judge of a court, that we do not consider those cases to control the determination of the instant case. However, the further factual distinction exists between the *Danielson* and *Schmitz* cases and the instant case in that in the instant case the decree itself is ambiguous. We do not consider the mere heading of the section of the decree which contains the provisions as to the principal sum to be binding on the nature of that payment. Except for the heading the decree indicates that the payment was in settlement of property rights which the petitioner asserted. The payments were absolute and would not cease with petitioner's remarriage or death as would ordinarily be the situation of a payment in discharge of the obligations imposed by the marital relationship. As heretofore discussed the other evidence of record supports the conclusion that the $125,000 was a property settlement payment.

Neither party in his brief discusses petitioner's allegation that she incorrectly reported in her 1966 income tax return an installment sale of common stock of CO–5 Co. and imputed interest. We are therefore left uninformed of petitioner's reasons for claiming an overpayment and of respondent's position with respect to this claim made by petitioner other than his denial in his answer of petitioner's allegation that she erroneously reported the $10,000.

However, there have been a number of cases considered by this Court involving whether property held in a wife's name or in the joint names of the parties was in fact the wife's property which the husband in effect purchased at the time of divorce or was the husband's property held in the wife's name. In *Harry L. Swaim*, 50 T.C. 302 (1968), affd. 417 F. 2d 353 (C.A. 6, 1969), and *Mildred F. Swaim*, 50 T.C. 336 (1968), affd. 417 F. 2d 358 (C.A. 6, 1969), we considered in sep-

arate cases the amounts to be included in taxable income of a divorced husband and wife as the result of a judgment of divorce entered by a Kentucky court in 1962, requiring the wife to restore to her husband all his property including two installment notes held in her name, and awarding one of the installment notes to the wife as part of her alimony. We held on authority of *United States* v. *Davis*, 370 U.S. 65 (1962), and certain decisions of this Court following the *Davis* case, that the husband realized a gain between his basis in the note awarded to the wife and the fair market value of that note at the time of the award. We held that the wife's basis in the note was its fair market value at the time it was awarded to her by the Court. In so holding we pointed out in *Harry L. Swaim, supra* at 305:

> It might seem at first blush that Mildred made a taxable disposition of the 1962 note payable to her when the Jefferson Circuit Court ruled that she had to restore it to Harry pursuant to Kentucky law. This restoration was at most, however, a transfer of bare legal title in view of the Jefferson Circuit Court's determination that the note was actually Harry's property. It follows that Mildred's transfer was not a taxable disposition. * * *

We distinguished the case of *Cofield* v. *Koehler*, 207 F. Supp. 73 (D. Kan. 1962), which had held that a husband who held jointly with his wife series E bonds did not realize capital gain from the accumulated interest thereon when upon a divorce and partition of jointly owned property of the parties the bonds were awarded to the wife in exchange for other jointly owned property of equal value. The facts in *Cofield* v. *Koehler, supra*, showed that the husband and wife, Lester and Marguerite Cofield, from the time of their marriage in 1934 had continued to operate a lumber business and other enterprises as partners. She was found to be equally competent with him in business matters. The court found that during their marriage they accumulated considerable property including a substantial number of series E Government bonds which were held in their joint names and a large amount of real estate. In 1958 the couple was divorced and the court awarded the wife permanent alimony of $5,000 and set aside to her as her separate property one-half of the jointly accumulated property specifically described in the decree. Included in the property set aside to her was approximately $56,000 of series E bonds. The court determined that the transfer of the bonds to the wife did not result in a taxable gain to the husband to the extent of previously unreported interest on the bonds since he exchanged the bonds in which he and his wife each had an undivided one-half interest for property of equal value also jointly owned by them, and that the decree did no more than set apart to each in severalty the interest they owned in their "community property." This case was decided subsequent to the decision in *United States* v. *Davis, supra*, but the opinion contains no discussion

of that case. However, if the jointly owned property involved in *Cofield* v. *Koehler*, *supra*, is to be treated comparable to "community property" of spouses in the States which have community property laws, the conclusion in that case is in line with our holding in *Frances R. Walz*, 32 B.T.A. 718 (1935), and a number of later cases that where a decree merely divides community property by setting aside a portion of the jointly owned property as the separate property of the wife and a portion of the jointly owned property as the separate property of the husband, no gain or loss is realized upon the division. The underlying theory is that there has been no sale or exchange of the community property but merely a division.

However, such cases have been distinguished from those where at the time of divorce, one party to the marriage acquired the interest of the other in the community property for cash. See *C. C. Rouse*, 6 T.C. 908 (1946), affd. 159 F. 2d 706 (C.A. 5, 1947). In such situations we have held that the transaction between the husband and wife is more in the nature of a sale than a division of the property. In *Jessie Lee Edwards*, 22 T.C. 65 (1954), we held that where the interest of the parties in community property was terminated by a settlement approved in a divorce decree whereby the wife was to receive cash and her husband's note in return for her interest in all of the community property except household furnishings and fixtures and an automobile, and the husband was to receive the jointly owned community property which consisted to an appreciable extent of corporate stock, a taxable transaction occurred. The wife in that case contended that nothing more was involved than an equal division of community property incident to a divorce which is a nontaxable transaction. In *Jessie Lee Edwards*, *supra* at 68, we pointed out that the transaction differed from a mere division or partition of community property and that "this is true despite the language used in the settlement agreement and the avoidance, whether calculated or not, of the usual verbiage connoting a sale." We pointed out that a number of cases had held that a settlement of community property interests where one party received cash may result in a taxable transaction in which gain or loss is realized since such transactions are in the nature of a sale by one party of his interest in property to the other.

From the facts we have set forth in this case, it is apparent to us that the negotiations between petitioner and Norman through their attorneys dealt primarily with the division of the stock of CO–5 Co. which, as the facts show, at least to the extent of 1,800 shares, was jointly owned by petitioner and Norman. In fact, in a letter dated as late as March 11, 1966, petitioner's attorney suggested to Norman's attorney that petitioner have one-half of the stock in CO–5 Co., giving Norman an irrevocable power of attorney to vote the stock, and that

the division be combined with an agreement in the nature of a buy-or-sell agreement in the event that either party should want to sell his stock. The facts here show that petitioner was an original partner in the CO-5 partnership. She contributed her services to that partnership to the same extent as other partners. The funds contributed to the partnership by petitioner and Norman came from a joint account which the record indicates contained funds produced from petitioner's actual work. With the amount of evidence here in the record indicating that petitioner in fact owned part of the CO-5 Co. stock and did not merely hold title to such stock for her husband, we are unwilling to conclude that petitioner erroneously treated the $10,000 payment to her in her 1966 income tax return as an installment payment of sales price of her stock.

Based on all the facts in this record, in our view the $125,000 is in the nature of the sales price received by petitioner for the CO-5 Co. stock which she owned and transferred to Norman. There is even evidence to indicate that the price is not out of line with the value of the stock. Therefore, without the benefit of the views of either party on this issue, we conclude that the situation here more closely resembles that involved in *Jessie Lee Edwards, supra,* and other similar cases than it does a property division or a transfer back to a husband of property which he in reality owned but was merely listed in his wife's name, such as the situation in *Harry L. Swaim, supra; Mildred F. Swaim, supra;* and *David R. Pulliam,* 39 T.C. 883 (1963), affd. 329 F. 2d 97 (C.A. 10, 1964), certiorari denied 379 U.S. 836 (1964), or a physical division of "community property" such as was involved in *Frances R. Walz, supra,* and *Cofield v. Koehler, supra.*

We, therefore, conclude that petitioner is entitled to no overpayment of income taxes for the calendar year 1966.

> *Decision will be entered that there is no deficiency due from or overpayment due to petitioner.*