T.C. Memo. 2001-109

UNITED STATES TAX COURT

ESTATE OF MARCIA P. HOFFMAN, DECEASED, ELISABETH HOFFMAN,
PERSONAL REPRESENTATIVE, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8632-98.                    Filed May 9, 2001.

Joseph D. Edwards and Albert P. Silva, for petitioner.

Michael A. Pesavento, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, Judge:  Respondent determined a deficiency of $930,864

in the Federal estate tax of the estate of decedent Marcia P.

Hoffman.  After concessions,[1] the issues for decisions are:  (1)

_____

[1]The notice of deficiency contained a number of adjustments
to decedent's estate tax return.  The parties have agreed to a
stipulation of settled issues which disposes of most of the
(continued...)

Whether guaranteed distributions under a marital settlement agreement survived decedent's death and are includable in her gross estate under section 2031;[2] and (2) the fair market value of certain property interests held by decedent at the time of her death.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, stipulation of settled issues, and the attached exhibits are incorporated herein by this reference.

Marcia P. Hoffman (decedent) died testate on February 18, 1994. The beneficiaries of her estate are her children and grandchildren. At the time of her death, decedent resided in Pinellas County, Florida. A Federal estate tax return was filed on behalf of decedent's estate on February 21, 1995, wherein the alternate valuation date, August 18, 1994, was selected. Donald F. Chamberlain, Sr. (Mr. Chamberlain), and Elisabeth Hoffman (Ms. Hoffman), decedent's daughter, were listed as the executors on decedent's estate tax return. Respondent sent notices of deficiency to both Mr. Chamberlain and Ms. Hoffman. In the

_____

[1](...continued)
adjustments. The remaining adjustments proposed by respondent remain disputed by the estate and are addressed in this opinion.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect as of the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

petition, Ms. Hoffman was listed as the executrix of decedent's estate.  At the time the petition was filed, Mr. Chamberlain resided in Michigan, and Ms. Hoffman resided in Illinois.

Decedent married Alfred Hoffman, Jr. (Mr. Hoffman), on June 2, 1961, and they had three children during their marriage.  On January 15, 1992, the marriage between decedent and Mr. Hoffman was dissolved in the Circuit Court of Pinellas County, Florida. Decedent and Mr. Hoffman entered into a "Marital Settlement Agreement" (the marital settlement), effective as of October 17, 1991, which was incorporated into the divorce decree.[3]  The presiding judge did not interpret the marital settlement or impose any conditions in addition to those set forth in the marital settlement.  The presiding judge noted that the marital settlement was fair and reasonable and was freely and voluntarily entered into by both parties with the full benefit of counsel and other experts.

Marital Settlement Agreement

The marital settlement was divided into 20 articles. Article I provided that the marital settlement was intended to be a full settlement of all matters pending in the divorce proceedings, including a division of the marital assets and provisions for the support of decedent.

---

[3]Art. XV of the marital settlement provided that "The laws of the State of Florida shall govern the validity, construction, interpretation and effect of this Agreement."

Article IV, entitled "Alimony", required Mr. Hoffman to pay decedent, as permanent alimony, the annual sum of $300,000, payable bimonthly in equal installments of $12,500. The combined amount of the bimonthly installments, $25,000, was referred to as the "INITIAL BASE MONTHLY ALIMONY AMOUNT." The payments commenced on January 1, 1992, and only the death of decedent or Mr. Hoffman would act to terminate the alimony due. The payments to decedent were described as alimony for spousal support and were intended by the parties to be taxable to decedent as income and deductible by Mr. Hoffman for Federal income tax purposes.

Article VI, entitled "Equitable Division of Marital Estate", divided the existing marital property of decedent and Mr. Hoffman and was intended to settle all issues regarding the marital property. In addition to other obligations, Mr. Hoffman was required to convey to decedent: (1) One-half of his 55-percent interest in Clubside Partnership (Clubside); (2) 100 percent of the stock of Hoffman Associates, Inc. (Hoffman Associates), and a loan receivable from Hoffman Associates; (3) 770 shares of stock in Walden Lake, Inc. (WLI); and (4) 560 shares of stock in Sun City Center, Inc. (SCC).

Paragraph 6.6B of article VI provided for distributions to decedent from WLI and SCC. In the event that WLI and SCC did not make the distributions by certain dates, Mr. Hoffman personally guaranteed payment of specific amounts to decedent on or before

the dates.  Paragraph 6.6B provided:

> B.  The parties contemplate that there shall be to
> each of them, as shareholders in * * * [WLI and SCC],
> distributions, from time to time, that will otherwise
> be effectuated pursuant to the articles and bylaws of
> the subject corporations, as well as Florida law.  In
> that regard, the Husband hereby personally guarantees
> to the Wife, the following distributions on or before
> the time hereinafter provided * * *

The dates and amounts of the distributions provided as part of

Mr. Hoffman's guaranty obligation were as follows:

| Date | Amount |
|------|--------|
| 12/31/1994 | $100,000 |
| 12/31/1996 | 250,000 |
| 12/31/1998 | 300,000 |
| 12/31/2000 | 400,000 |
| 12/31/2002 | 500,000 |
| 12/31/2004 | 450,000 |
| Total | 2,000,000 |

The remainder of paragraph 6.6B provided:

> The parties' current relationship as shareholders
> of * * * [SCC and WLI] as well as the current financing
> relationships with the Bank of Boston authorize and
> contemplate distributions to the shareholders for the
> purpose of paying income taxes on undistributed,
> taxable income to the shareholders.  None of the
> foregoing guaranteed distribuitions [sic] shall be
> deemed to be reduced by any distributions to the
> shareholders made solely for the purpose of paying
> federal income taxes due upon undistributed, taxable
> income to said shareholders from the Subchapter S
> corporations.  It is the intention of this paragraph
> that the Husband shall personally guarantee to the
> Wife, the distributions as set forth above from the
> corporations, on a cumulative basis, on or before the
> dates indicated.  In the event such distributions are
> not made pursuant to the aforementioned paragraph
> consistent with the articles and bylaws of the
> applicable corporations, then Husband shall be
> personally obligated to pay the aforementioned funds to
> the Wife, on or before the dates above.  In the event
> that the Husband is required to personally fund such

money in lieu of corporate distributions, then, and in that event, he shall be entitled to be repaid by the Wife, without interest, from such distribution ultimately received by the Wife, at such time these distributions are received and exceed the guaranteed amounts of payments pursuant to § 6.6(B) due as of that time.  Further, in the event that the Wife should sell all or a portion of her stock in either of the corporations, Husband shall also be entitled to be repaid by the Wife for any personally guaranteed amounts funded in lieu of corporate distributions, without interest, from the net after tax proceeds of any such sale to the extent such net after tax proceeds, together with all personally guaranteed amounts and prior distributions to her pursuant to § 6.6(B) exceed the sum of Two million ($2,000,000.00) dollars.

Paragraph 6.6D provided that nothing in the marital settlement, "except for the cumulative receipt by the Wife" of the payments specified in paragraph 6.6B, would satisfy Mr. Hoffman's obligation for the payment of $2 million in personal guaranties.  The marital settlement did not state that the $2 million guaranty was in the form of alimony and was silent as to whether Mr. Hoffman's obligation to decedent terminated at the death of either party.

Article IV contained an offset provision related to article VI.  Paragraph 4.2 provided that the annual alimony received by decedent would be reduced by $80 per year (at a rate of $6.67 per month) for each $1,000 received by decedent after January 1, 1992, pursuant to the terms of paragraph 6.6B.  Article IV further provided:

> 4.3  Notwithstanding the fact that all amounts received by the Wife as the INITIAL BASE MONTHLY

ALIMONY AMOUNT shall be deemed taxable to the Wife and deductible by the Husband for federal income tax purposes, it is the intent of the parties that all amounts received by the Wife pursuant to Paragraph 6.6(B), although they may operate to ultimately reduce the alimony amount payable by the Husband, shall not be deemed taxable to the Wife as income nor deductible by the Husband for federal income tax purposes. It is intended by the parties that the * * * [guaranteed payment under paragraph 6.6B for $300,000 due on or before December 31, 1998], upon being paid, will create a principal sum for the Wife which, if invested at the rate of eight percent (8%), will create sufficient income to reduce her need for permanent alimony contemplated by this Agreement, based upon the aforementioned terms.

Paragraph 6.6E contained another offset provision. This provision related to compensation received by Mr. Hoffman for his performance of all services related to SCC and WLI or other investments. Paragraph 6.6E provided that decedent was to receive 35 percent of any and all posttax amounts received by Mr. Hoffman as direct or indirect compensation in connection with his employment, to the extent that such compensation amounts exceeded $600,000 for any 1 calendar year. To the extent decedent received any payments pursuant to this provision, the amounts received would constitute partial satisfaction of Mr. Hoffman's guaranty obligation under paragraph 6.6B. At such time as Mr. Hoffman paid all the amounts as required under paragraph 6.6B, the obligation that Mr. Hoffman pay decedent the excess compensation over $600,000 annually would terminate.

Property Interests Held by Decedent at Time of Death

At the time of her death, decedent owned a 27.5-percent interest in Clubside, a partnership owned collectively by decedent and her family.[4] Mr. Hoffman owned a 27.5-percent interest in Clubside, and the three children each held 15-percent interests.

As of August 18, 1994, the asset-to-liability ratio of Clubside was approximately 3 to 1. As of that date, it appears Clubside had cash of approximately $3,176. Clubside's only significant asset was certain real property (Cathead property) located on North Cathead Point Road in Northport, Michigan. The Cathead property consisted of approximately 102 acres of waterfront property on Lake Michigan.[5] As of December 30, 1992, the highest and best use of the Cathead property was the development of the land into 20 waterfront improved sites which

---

[4]The parties stipulated that decedent was a partner of Clubside at the time of her death. In its brief, the estate argues for the first time that the partnership interest was owned by decedent's revocable trust. Our analysis and valuation of the property interests in issue are the same regardless of whether decedent or decedent's revocable trust was the owner of the partnership interest. Because the partnership interest is includable in decedent's gross estate in either situation and our valuation analysis is not affected by such a determination, we shall refer to the partnership interest as being owned by decedent.

[5]The Cathead property included a two-story house located on an 8.5-acre site with 300 feet of lake frontage which was owned at the time of the appraisal by decedent and Mr. Hoffman, not Clubside.

could be built upon.  At that time, the Cathead property was not listed for sale, and there were no known offers to purchase.  An appraisal of the Cathead property, as of December 30, 1992, was performed by Juan Carbonell and Michael Tarnow (the Carbonell and Tarnow report).  The Carbonell and Tarnow report based its valuation on a sales comparison approach[6] and assumed that the waterfront lots could be sold over a 5-year period.  The retail sales prices realized during each year of the sale period were discounted by 9 percent to estimate their net present value.[7]  On the basis of the considerations above, the Carbonell and Tarnow report valued the entire Cathead Property at $3,417,092.  Of this amount, $870,000 was attributed to the house owned by decedent and Mr. Hoffman.

As of December 31, 1993, Clubside's liabilities consisted of accounts payable of $499 and the following promissory notes:

| Note Payable | Amount | Interest Rate | Maturity Date |
|---|---|---|---|
| Melissa Hoffman Trust | $24,000 | 7.61% | 1/01/2012 |
| Matthew Hoffman Trust | 24,000 | 7.61% | 1/01/2012 |
| Elisabeth Hoffman Trust | 24,000 | 7.61% | 1/01/2012 |
| Hoffman Associates | 278,147 | 7.61% | 1/01/2012 |

---

[6]The Carbonell and Tarnow report compared the Cathead property to other properties with similar uses and utility that had recently been sold.  Next, dollar adjustments were made to account for the differences between the Cathead property and the comparables.  The adjustments were totaled and factored into the sales prices of the comparables to indicate a probable sales price for the Cathead property.

[7]The 9-percent discount rate was arrived at by taking the prime interest rate (6 percent) plus 1 percent and adding 1 percent each for risk and nonliquidity factors.

| | | | |
|---|---|---|---|
| Marcia Hoffman | 173,063 | 7.61% | 1/01/2012 |
| Al Hoffman, Jr. | 189,053 | 7.61% | 1/01/2012 |
| Melissa Hoffman | 62,333 | 7.61% | 1/01/2012 |
| Matthew Hoffman | 62,334 | 7.61% | 1/01/2012 |
| Elisabeth Hoffman | 62,333 | 7.61% | 1/01/2012 |
| Total | 899,263 | | |

The notes were unsecured, interest was to accrue, and no interest or principal payments were required until January 1, 2012.[8] However, at least with respect to the promissory notes payable to decedent and Hoffman Associates, Clubside could prepay in full or in part, without penalty, with any such prepayment first applied to accrued interest and the balance applied to principal. Additionally, approximately $20,000 a year in taxes and maintenance on the Cathead property was paid by Mr. Hoffman. Clubside's obligations to Mr. Hoffman were increased by these amounts. In a financial statement dated June 3, 1994, Mr. Hoffman's accountant estimated the value of Mr. Hoffman's 27.5-percent interest in Clubside at $491,966 as of December 31, 1993.

At the time of her death, decedent owned all 7,500 shares of stock in Hoffman Associates, an S corporation. The principal asset owned by Hoffman Associates was the Clubside promissory note with a value at the date of maturity of $278,147, plus accrued interest at a rate of 7.61 percent over 20 years.

At the time of her death, decedent owned 560 shares of

---

[8]The promissory notes payable to decedent and Hoffman Associates were created on Jan. 1, 1992. It appears from the evidence in the record that the remaining promissory notes were also created on Jan. 1, 1992.

common stock of SCC, representing 16.09 percent of the outstanding common stock. Decedent also owned 770 of the 3,480 outstanding shares of common stock of WLI, constituting a 22.13-percent interest in WLI. As of the valuation date, WLI was an S corporation whose principal business was the development and sale of home sites and improved acreage within the Walden Lake Development, located in Plant City, Florida. WLI had the following net earnings for the years 1990 through 1993:

| Year | Net Earnings |
|------|--------------|
| 1990 | $1,682,795 |
| 1991 | 455,706 |
| 1992 | 1,025,958 |
| 1993 | 423,769 |

For the years 1990, 1991, 1992, and 1993, financial statements with independent auditor's reports were prepared on behalf of WLI, SCC, and other affiliated companies sharing common ownership. For the years 1990 through 1992, separate audits were made of WLI. For 1993, the audit combined the activities of WLI with SCC and other affiliated companies sharing common ownership. For the years 1991, 1992, and 1993, the earnings of WLI included profits from intercompany transactions with SCC and the affiliates.

## OPINION

The Internal Revenue Code imposes a Federal estate tax on the transfer of the taxable estate of a decedent who is a citizen or resident of the United States. See secs. 2001 and 2002. The

value of the gross estate includes the value of all property to the extent of the decedent's interest therein on the date of death. See sec. 2033. The executor, however, may elect to value a decedent's property as of an alternate valuation date; i.e., 6 months after death. See sec. 2032. The election to value decedent's property as of the alternate valuation date was made in the instant case. The term value means fair market value, which is defined for Federal estate tax purposes as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." United States v. Cartwright, 411 U.S. 546, 551 (1973); sec. 20.2031-1(b), Estate Tax Regs. The parties dispute: (1) Whether the guaranty obligation of Mr. Hoffman is includable in decedent's gross estate, and (2) the value of certain property interests includable in decedent's gross estate.

A.    Guaranty Provision in Marital Settlement Agreement

The estate argues that the guaranty obligation of Mr. Hoffman is not includable in the gross estate because it terminated on the death of decedent. The estate contends that the marital settlement is ambiguous, and, when read in conjunction with the testimony of its witnesses, the marital settlement contemplates that the guaranty was to terminate on decedent's death. Respondent argues that the marital settlement

is unambiguous and provides for guaranteed payments which survive decedent's death and are includable in the gross estate.

The parties presented arguments on brief regarding whether we should apply the rule enunciated in <u>Commissioner v. Danielson</u>, 378 F.2d 771 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965),[9] or the less stringent "strong proof" rule.[10] However, the <u>Danielson</u> rule and the strong-proof rule apply only in the case of an unambiguous agreement. See <u>Gerlach v. Commissioner</u>, 55 T.C. 156, 169 (1970); <u>Pettid v. Commissioner</u>, T.C. Memo. 1999-126. Because we find the terms of the marital settlement ambiguous, we do not apply either the <u>Danielson</u> rule or the

---

[9]The <u>Danielson</u> rule provides:

a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc. * * * [<u>Commissioner v. Danielson</u>, 378 F.2d 771, 775 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965).]

[10]Under the strong-proof rule, a taxpayer can ignore unambiguous terms of a binding agreement only if he presents "strong proof", that is, more than a preponderance of the evidence that the terms of the written instrument do not reflect the actual intentions of the contracting parties. <u>Elrod v. Commissioner</u>, 87 T.C. 1046, 1066 (1986). This Court generally applies the strong-proof rule. See <u>id.</u> at 1065; <u>Coleman v. Commissioner</u>, 87 T.C. 178, 202 (1986), affd. without published opinion 833 F.2d 303 (3d Cir. 1987); <u>Ullman v. Commissioner</u>, 29 T.C. 129 (1957), affd. 264 F.2d 305 (2d Cir. 1959). However, if the case is appealable to a circuit which has adopted the <u>Danielson</u> rule, then we are bound to apply that rule. See <u>Golsen v. Commissioner</u>, 54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

strong-proof rule.[11]  See <u>Pettid v. Commissioner</u>, <u>supra</u>.

The marital settlement, in reference to the guaranty obligation of Mr. Hoffman, consistently refers to payments made "to the Wife", and the possibility that "the Wife" would have to repay amounts to Mr. Hoffman if corporate distributions from SCC and WLI exceeded guaranteed payments made by Mr. Hoffman under the guaranty provision.  There is no reference to decedent's heirs or assigns in connection with decedent or Mr. Hoffman's obligations under the guaranty provision.  Additionally, the offset provisions found in the alimony section, and the guaranty obligation found in the division of marital property section, are dependent on each other for purposes of determining the amount of spousal support decedent was required to receive.  The alimony payments, which were intertwined with the guaranty obligation and excess compensation provisions, terminated on the death of either decedent or Mr. Hoffman.  On the basis of the language in the guaranty provision and the dependent relationship between that provision and the alimony section, we find that the terms of the marital settlement are unclear with respect to whether the guaranty obligation of Mr. Hoffman survived decedent's death.

---

[11]This Court has been reluctant to apply either rule in situations involving the interpretation of a divorce settlement agreement.  See <u>Weiner v. Commissioner</u>, 61 T.C. 155, 159-160 (1973); <u>Mirsky v. Commissioner</u>, 56 T.C. 664, 674-675 (1971); <u>Gerlach v. Commissioner</u>, 55 T.C. 156, 169 (1970); <u>Hopkinson v. Commissioner</u>, T.C. Memo. 1999-154.

The estate is not attempting to alter the unambiguous terms of the marital settlement and thus avoid the tax consequences which flow from it.  Rather, the estate introduced the testimony of three witnesses with personal knowledge of the marital settlement in order to show that the parties intended the guaranty obligation of Mr. Hoffman to be personal to decedent only and to terminate upon the death of either party.  For purposes of this case, the relevant inquiry is whether, under the terms of the marital settlement, the guaranty obligation of Mr. Hoffman terminated on the death of decedent.

Mr. Hoffman testified that the guaranteed payments were tied to alimony and that he did not intend for the guaranty obligation to survive decedent's death.  He stated that the guaranty provision was inserted into the marital settlement because he did not have enough cash up front to pay the amount of alimony that decedent wanted; thus, the parties to the marital settlement negotiated lower monthly alimony payments in the initial years after the divorce in return for larger payments of cash in future years.  Mr. Hoffman testified that on the date the final guaranteed payment was due, decedent would presumably have been able to sell the SCC and WLI stock and liquidate her holdings, thereby meeting her financial needs.  Mr. Hoffman testified that he had not made any payments pursuant to the guaranty obligation because he believed the guaranty obligation ceased at decedent's

death, and, further, that he did not intend to make any payments to the estate under the guaranty.[12]

The estate also presented the testimony of Stephen Sessums (Mr. Sessums), the attorney who represented Mr. Hoffman in his divorce proceedings with decedent.  Mr. Sessums testified that he participated in the drafting of the marital settlement and that the guaranty obligation was intended to run personally to decedent and to terminate on her death.  He noted that the guaranty provision did not preserve the right to the guaranteed payments for decedent's heirs or assigns and that death was not inserted into the agreement as a condition terminating the guaranteed payments because it was not contemplated that the guaranties would flow to anyone else.  Mr. Sessums testified that he believed that neither party intended for Mr. Hoffman to make the guaranteed payments after the death of decedent and that the guaranty provision was simply a backup for the alimony and was intended to give decedent self-sufficiency.

Finally, the estate presented the testimony of Mark Ossian (Mr. Ossian), one of decedent's attorneys in her divorce proceedings.  Mr. Ossian testified that the guaranty obligation of Mr. Hoffman was tied to the alimony provision and that the whole intention of the guaranteed payments was to provide

---

[12]We note that Mr. Hoffman is not a beneficiary of decedent's estate.

decedent assistance for her support.  He stated that once decedent received the guaranteed payments during her lifetime, her need for support would be decreased and her need for alimony would be offset.  Mr. Ossian testified that it was his understanding that, upon death of decedent, Mr. Hoffman would not be required to make any payments because the payments were only for the support of decedent.

The marital settlement provides that the guaranteed payments were to be made "to the Wife" and that "the Wife" would be required to repay corporate distributions in excess of the guaranteed payments.  The guaranteed payments were connected with specific alimony payments in a manner which allowed the amount of the alimony payments to be reduced in the event that the guaranteed payments were made.  The portions of the marital settlement relating to the alimony and guaranty obligation of Mr. Hoffman are unclear because the guaranty obligation could either survive decedent's death, or terminate at the time of that event, depending on how one reads the provision.  The estate presented testimony from three witnesses with personal knowledge of the circumstances surrounding the negotiation and drafting of the marital settlement.  All three witnesses were credible and consistent in their testimony that the intention of the parties was that the guaranteed payments were to terminate on the death of decedent.  On the basis of the evidence in the record, we hold

that the guaranteed payments were intended to, and did, terminate on the death of decedent.

Alternatively, respondent argues that even if the guaranty obligation were not part of the division of marital property, the value of the payments required under the guaranty obligation is still includable in decedent's gross estate because the guaranteed payments were in the form of lump-sum alimony. Florida recognizes three types of alimony:  (1) Lump-sum alimony; (2) periodic alimony;[13] and (3) rehabilitative alimony.  See Fla. Stat. Ann. sec. 61.08(1) (West 1997).[14]  Under Florida law, lump-sum alimony is essentially the payment of a definite sum (which may be paid in installments).  See Mann v. Commissioner, 74 T.C. 1249, 1260 (1980); see also Canakaris v. Canakaris, 382 So.2d 1197, 1201 (Fla. 1980).  Lump-sum alimony creates a vested right which survives death.  See Mann v. Commissioner, supra at 1260;

---

[13]Permanent periodic alimony is most commonly used to provide support, although its use may be appropriate in limited circumstances to balance inequities which may result from the allocation of income-generating property acquired during the marriage.  See Canakaris v. Canakaris, 382 So.2d 1197, 1202 (Fla. 1980).  As a general rule, permanent periodic alimony terminates on the death of either spouse or the remarriage of the receiving spouse.  See id.

[14]Fla. Stat. Ann. sec. 61.08(1) (West 1997) authorizes the trial judge to "grant alimony to either party, which alimony may be rehabilitative or permanent in nature.  In any award of alimony, the court may order periodic payments or payments in lump sum or both."  Canakaris v. Canakaris, supra at 1200.

Estate of Gary v. Commissioner, T.C. Memo. 1991-38; Canakaris v. Canakaris, supra at 1201.

Respondent argues that the guaranteed payments were in the form of lump-sum alimony; thus, they survived decedent's death and are includable in the gross estate. We disagree. The marital settlement was entered into by decedent and Mr. Hoffman after lengthy negotiations. The terms of the marital settlement were freely and voluntarily entered into by the parties with the full benefit of advice from counsel and other experts. In the "Final Judgment of Dissolution of Marriage", the presiding judge dissolved the marriage between decedent and Mr. Hoffman and approved, ratified, and confirmed the marital settlement. The presiding judge did not interpret the marital settlement or impose additional conditions. The term "lump-sum alimony" is not used in the marital settlement or in the final judgment to describe the guaranty obligation. The payments described in the alimony section pertaining to the initial base monthly alimony amount were described as "permanent alimony". As we discussed earlier, the guaranty obligation was linked to these payments by an offset provision. After reviewing the evidence in the record, we find no indication that the guaranty obligation was intended by either the parties or the presiding judge to constitute "lump-sum alimony" under Florida law. Because the form of the guaranteed payments was not specifically defined by the marital

settlement or the presiding judge, we rely on our prior findings with respect to the intentions of the parties. As we held earlier, the guaranty obligation was not intended to survive decedent's death, and we do not find evidence establishing that the guaranteed payments were in the form of lump-sum alimony. Accordingly, we hold that the guaranty obligation is not includable in decedent's gross estate.

B.    Property Interests Held by Decedent at Time of Death

Both parties relied on the reports and testimony of experts to determine the value of decedent's property interests for estate tax purposes. While expert opinions may assist in evaluating a claim, we are not bound by these opinions and may reach a decision based on our own analysis of all the evidence in the record. See Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938); Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990). Where experts offer conflicting estimates of fair market value, we examine the factors they used and decide the appropriate weight given to each. See Casey v. Commissioner, 38 T.C. 357, 381 (1962). We may accept the opinion of an expert in its entirety, see Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980), or we may be selective in the use of any portion, see Parker v. Commissioner, 86 T.C. 547, 562 (1986).

The parties dispute the value of: (1) Two promissory notes, (2) decedent's 27.5-percent interest in Clubside, and (3) decedent's stock interest in WLI.

1. Value of Clubside Promissory Notes

The parties dispute the value of two promissory notes of Clubside, one payable to decedent and the other payable to Hoffman Associates (of which decedent owned 100 percent of the outstanding stock).

For estate tax purposes, "the fair market value of notes, secured or unsecured, is presumed to be the amount of unpaid principal, plus interest accrued to the date of death, unless the executor establishes that the value is lower or that the notes are worthless." Sec. 20.2031-4, Estate Tax Regs. The burden of proof is on the taxpayer to submit satisfactory evidence that the note is worth less than the face value plus accrued interest (e.g., because of the date of maturity, interest rate, or other cause). See Estate of Pittard v. Commissioner, 69 T.C. 391, 399 (1977); Estate of Berkman v. Commissioner, T.C. Memo. 1979-46; sec. 20.2031-4, Estate Tax Regs. In the instant case, both parties departed from the presumed fair market value and discounted the promissory notes from the date of maturity to the valuation date.

Respondent relies on the report and testimony of his expert appraiser, Mark Mitchell (Mr. Mitchell), to determine the value

of the Clubside promissory notes payable to decedent and Hoffman Associates. Mr. Mitchell determined the value of the notes based on the timing of payments and the rate of return that a holder of the notes would require. To determine a proper return rate, he reviewed: (1) Interest rates of various debt securities; (2) corporate bonds of various ratings; (3) interest rates for conventional mortgages, 30-year and 1-year Treasury securities, and bank prime loans; and (4) venture capital returns. Mr. Mitchell felt that the promissory notes did not possess characteristics of bonds that were in default and highly speculative in nature because the net proceeds from a sale of Clubside's assets (the Cathead property) would be sufficient to satisfy all debt obligations as of the valuation date. Mr. Mitchell felt that rates ranging from 10-to-15 percent would adequately account for the risk of the promissory notes and concluded that 12.5 percent was the appropriate rate.[15] Mr. Mitchell stated that he believed that this rate of return incorporated the lack of marketability of the promissory notes. Mr. Mitchell assumed that the notes would not be paid until the date of maturity; therefore, he applied the 12.5-percent rate of return to the values he assigned the promissory notes as of the

---

[15]Mr. Mitchell noted that this rate of return was more than 5 percent above the bank prime loan rate and approximately 2 percent above a B-rated bond, which he explained has vulnerability to default but currently has the capacity to meet interest and principal payments.

date of maturity, $436,465[16] and $701,481,[17] respectively.  On the
basis of a 12.5-percent rate of return, Mr. Mitchell concluded
that the values of the promissory notes payable to decedent and
Hoffman Associates were $56,664 and $91,070, respectively, as of
the valuation date.

The estate relies on the report and testimony of its expert
appraiser, Benjamin Bishop (Mr. Bishop), to determine the value
of the Clubside promissory notes payable to decedent and Hoffman
Associates.  Mr. Bishop relied on public markets for guidance to
determine an appropriate rate of return that a knowledgeable
investor would require for obligations similar in maturity and
quality to the promissory notes.  Specifically, he relied on
Moody's, Standard & Poor's, and Fitch rating agencies to find
comparable debt securities.  Mr. Bishop felt that the Clubside
notes were most comparable with the lowest-ranked securities,
which required an approximate 18-percent rate of return.  Mr.
Bishop felt a lack of marketability discount was appropriate
because the comparable bonds he used could be sold at any time in

---

[16]The amount of principal at maturity, plus accrued interest
at a rate of 7.61 percent over 20 years.

[17]The amount of principal at maturity, plus accrued interest
at a rate of 7.61 percent over 20 years.  Although Mr. Mitchell
arrived at a figure of $701,481 as the total payment at the date
of maturity, we note that application of the figures used results
in a value of $701,487.  Application of the 12.5-percent rate of
return by Mr. Mitchell results in the same figure, $91,070, that
he determined as the value of this note.

the public market while the Clubside notes lacked a public market for sale.  To account for this lack of marketability, Mr. Bishop concluded that a knowledgeable investor would require a rate of return at least 25 percent higher than the 18-percent return offered by his comparable publicly traded bonds; thus, he determined that the appropriate rate of return for the Clubside notes was 22.5 percent.  Based on a 22.5-percent rate of return, Mr. Bishop calculated that the present value of $1 received in 17 years and 4 months; i.e., the length of time between the valuation date and the date of maturity of the promissory notes, was $.039.  Mr. Bishop applied the present value of $.039 to the values as of the date of maturity and concluded that the values of the promissory notes payable to decedent and Hoffman Associates were $17,022 and $27,358, respectively, as of August 18, 1994.[18]

We are not persuaded by the analysis and conclusions of Mr. Bishop.  His testimony reflected a lack of knowledge concerning the comparable companies used, and he failed to properly link them to Clubside.  Mr. Bishop admitted that all the comparables used were "highly speculative" and that none of the comparables dealt with real estate.  Mr. Bishop testified that he had "no idea" what the asset-to-liability ratio was for any of the

[18]Mr. Bishop assigned values to the promissory notes as of the date of maturity of $436,464 and $701,487, respectively.

companies, and he was unable to provide any type of business connection between the comparables and Clubside. Furthermore, Mr. Bishop lacked knowledge of the line of business that some of the companies were engaged in. Mr. Bishop's failure to adequately explain in his report or at trial how the companies used were comparable to Clubside entitles his findings to little weight. See, e.g., Estate of Fleming v. Commissioner, T.C. Memo. 1997-484. Overall, the comparable companies used by Mr. Bishop were riskier in nature and did not accurately reflect the financial position of Clubside.[19]

As of the valuation date, the Clubside promissory notes payable to decedent and Hoffman Associates were unsecured and had over 17 years remaining until the date of maturity. Interest was to accrue until the date of maturity; thus, Clubside was not under any obligation to make interest or principal payments until January 1, 2012. Clubside had other promissory notes, and there

---

[19]Mr. Bishop's valuation was questionable in another area as well. Application of a 22.5-percent rate of return to value the promissory notes produces valuation amounts below those determined by Mr. Bishop. For example, the $17,022 and $27,358 values determined by Mr. Bishop would have been $12,950 and $20,813, respectively, based on a 22.5-percent rate of return over 17 years and 4 months based on maturity values of $436,464 and $701,487, respectively. Application of the values determined by Mr. Bishop reflects either: (1) A rate of return of 20.58 percent over 17 years and 4 months; or (2) a rate of return of 22.5 percent over 16 years. We note that we have calculated these figures using basic present value formulae. See, e.g., Spera v. Commissioner, T.C. Memo. 1998-225 n.2, supplemented by T.C. Memo. 1998-299.

is no evidence that these notes were subordinate to the notes payable to decedent and Hoffman Associates. The main asset of Clubside was the Cathead property, and Clubside's available cash was negligible as of the valuation date. However, as of the valuation date, Clubside's asset-to-liability ratio was approximately 3 to 1, and Clubside had the option to prepay the notes in full or in part, without penalty, at any time. There is no evidence in the record to indicate that the promissory notes would not be honored by Clubside as of the date of maturity. We believe that a willing buyer would consider all these factors in determining an appropriate rate of return on an investment of this nature. After reviewing the reports and testimony of both parties' experts, we agree with respondent that a 12.5-percent rate is appropriate and hold that the values of the promissory notes payable to decedent and Hoffman Associates were $56,664 and $91,070, respectively, as of the valuation date.

2. Value of 27.5-Percent Interest in Clubside Partnership

At the time of her death, decedent held a 27.5-percent interest in Clubside. Respondent determined that decedent's interest was worth $338,000 as of the valuation date. The estate determined that decedent's interest was worth $290,582 as of the valuation date.[20]

---

[20]At trial, Mr. Bishop admitted that he erred in his analysis because he did not properly account for the value of the

(continued...)

For estate tax purposes, the fair market value of an interest in a partnership "is the net amount which a willing purchaser, whether an individual or a corporation, would pay for the interest to a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Sec. 20.2031-3, Estate Tax Regs. All relevant factors are considered, including: (1) A fair appraisal of all assets of the partnership; (2) the demonstrated earning capacity of the partnership; and (3) other specific factors, to the extent applicable, relating to the valuation of corporate stock. See id.

Respondent relies on his appraiser, Mr. Mitchell, who valued the partnership interest under a discounted net asset value approach. Mr. Mitchell determined the net asset value of the partnership, applied lack of marketability and minority interest discounts, and then applied this figure to decedent's 27.5-percent interest. The estate relied on its appraiser, Mr. Bishop, who valued the partnership interest under a liquidation approach. Mr. Bishop determined the value of decedent's interest by projecting the sale of Clubside's assets over 3 years, subtracting liabilities, applying decedent's percentage ownership

---

[20](...continued)
promissory notes. After adjusting for this error, Mr. Bishop testified that the value of the partnership interest was $289,913.

interest, and then applying a rate of return he felt a knowledgeable investor would require.

Clubside's only significant asset as of the valuation date was the Cathead property. Mr. Bishop and Mr. Mitchell both relied on the Carbonell and Tarnow report which valued the entire Cathead property at $3,147,092 as of December 30, 1992, of which $870,000 was attributed to the house owned by decedent and Mr. Hoffman. Mr. Bishop determined that the fair market value of the Cathead property owned by Clubside was $2,547,092[21] as of August 18, 1994, while Mr. Mitchell determined that the fair market value of the property as of that date was $2,685,057.[22]

The liabilities of Clubside as of the valuation date consisted of accounts payable of $499 and the following promissory notes payable:

| Note Payable | Amount | Interest Rate | Maturity Date |
|---|---|---|---|
| Melissa Hoffman Trust | $24,000 | 7.61% | 1/01/2012 |
| Matthew Hoffman Trust | 24,000 | 7.61% | 1/01/2012 |
| Elisabeth Hoffman Trust | 24,000 | 7.61% | 1/01/2012 |
| Hoffman Associates | 278,147 | 7.61% | 1/01/2012 |
| Marcia Hoffman | 173,063 | 7.61% | 1/01/2012 |
| Al Hoffman, Jr. | 189,053 | 7.61% | 1/01/2012 |
| Melissa Hoffman | 62,333 | 7.61% | 1/01/2012 |

---

[21]Mr. Bishop reached his determination by subtracting the value of the house owned by decedent and Mr. Hoffman from the value of the entire Cathead property.

[22]Mr. Mitchell reached his determination by making certain adjustments to the figures determined in the Carbonell and Tarnow report. Specifically, he adjusted the value of the property upward to account for its present value and then subtracted the present value of the house, commissions costs, holding costs, and road improvement costs.

| | | | |
|---|---|---|---|
| Matthew Hoffman | 62,334 | 7.61% | 1/01/2012 |
| Elisabeth Hoffman | 62,333 | 7.61% | 1/01/2012 |
| Total | 899,263 | | |

Mr. Mitchell discounted the face value of each note plus the accrued interest thereon.  Mr. Mitchell determined that the total discounted value of the notes payable was $294,434, based on his appraisal of the promissory notes payable to decedent and Hoffman Associates.[23]  Mr. Mitchell also determined that the combined value of property taxes on the Cathead property and the interest liability[24] which would accrue with respect to additional debt as a result of the payment of taxes, as of January 1, 2012, would be $566,992[25] and discounted this figure using the same 12.5-percent

---

[23]Mr. Mitchell determined that an investor would require a 12.5-percent rate of return for the Clubside promissory notes. Mr. Mitchell applied the 12.5-percent rate of return to the other notes payable to determine the total value of the notes payable as of the valuation date.  The following chart sets forth Mr. Mitchell's computations:

| Note Holder | Value at Maturity | Fair Market Value |
|---|---|---|
| Melissa Hoffman Trust | $24,000 | $7,858 |
| Matthew Hoffman Trust | 24,000 | 7,858 |
| Elisabeth Hoffman Trust | 24,000 | 7,858 |
| Hoffman Associates | 278,147 | 91,070 |
| Marcia Hoffman | 173,063 | 56,664 |
| Al Hoffman, Jr. | 189,053 | 61,899 |
| Melissa Hoffman | 62,333 | 20,409 |
| Matthew Hoffman | 62,334 | 20,409 |
| Elisabeth Hoffman | 62,333 | 20,409 |
| Totals | 899,263 | 294,434 |

[24]Interest was factored into the property tax liability because Mr. Hoffman was funding the property tax payments.

[25]This figure consists of $360,000 of property taxes and $206,992 of interest on the property taxes.

rate applied to the promissory notes, resulting in a liability of $73,609 as of the valuation date.  Mr. Mitchell subtracted the discounted value of the notes payable, the property taxes and interest, and the $499 accounts payable from the fair market value of Clubside's assets, and arrived at a net asset value of $2,319,634.  Mr. Mitchell felt that a 35-percent lack of marketability discount and an 18-percent minority interest discount were appropriate for Clubside.[26]  Mr. Mitchell determined that the aggregate value of Clubside was $1,229,406 and that the fair market value of decedent's 27.5-percent interest was $338,000.[27]

Mr. Bishop determined the value of decedent's partnership interest in a different manner.  He projected the sale of the Cathead property over a period of 3 years.  Then, Mr. Bishop subtracted the amount of interest that would accrue on the promissory notes and the amount of property taxes due on the Cathead property after 3 years.  Mr. Bishop assumed that the value of the Cathead property would remain constant at

---

[26]The estate does not object to the percentage figures used by Mr. Mitchell in applying the lack of marketability and minority interest discounts.  Mr. Mitchell combined the two discounts, resulting in a combined discount rate of 46.7 percent, which he rounded up to 47 percent.

[27]We note that respondent's valuation is more than 25 percent less than the value determined as of Dec. 31, 1993, in the financial statement prepared for Mr. Hoffman by his accountant.

$2,547,092, and he estimated that property taxes and interest on the promissory notes would amount to $250,000 after 3 years. The net amount, $2,297,092, was the value he determined the partnership would have after 3 years. Mr. Bishop felt that a knowledgeable investor would require a 30-percent annual return on such an investment based on the following assumptions: (1) The interest was an illiquid minority interest in a family partnership that would be difficult to market; (2) the only source of cash-flow would be from the sale of real property, and no such sales had taken place as of the valuation date; (3) the holders of the remaining 72.5 percent of the partnership were related, would manage the affairs in a responsible manner, and Mr. Hoffman would continue to provide the cash to the partnership to pay property taxes; and (4) the notes and accrued interest thereon would total over $2 million by the year 2012, making a cash return on the partnership equity unlikely. Application of a 30-percent return over 3 years, as adjusted for decedent's 27.5-percent interest, yielded a fair market value for decedent's partnership interest of $290,582.[28]

We are not persuaded by the reports and testimony of Mr. Bishop with respect to the value of decedent's interest in Clubside. Mr. Bishop relied on the value assigned to the Cathead

---

[28]As we noted earlier, Mr. Bishop testified that he made an error in his valuation and that the corrected value of the partnership interest was $289,913.

property by the Carbonell and Tarnow report.[29]  The Carbonell and Tarnow report determined the value of the Cathead property based on a sale of all parcels of the Cathead property over a 5-year period and with a 9-percent required rate of return.  However, in valuing decedent's interest in Clubside, Mr. Bishop projected a sale of all parcels of the Cathead property over a 3-year period and with a 30-percent required rate of return.  The estate failed to explain why it used a 3-year period when it relied on the Carbonell and Tarnow report which used a 5-year period.  In support of a 30-percent rate of return, Mr. Bishop testified that he used that figure based on his experience and judgment, and the fact that Clubside was a closely held family partnership with no basic agreements to sell anything.  We find Mr. Bishop's 30-percent rate of return over 3 years to be excessive based on the facts before us.  Mr. Bishop stated in his valuation report that he had discussions with real estate brokers located near the Cathead property who told him that property values in that vicinity of the Lake Michigan coastline area were stable with modest appreciation.  The estate presented no evidence to justify a 30-percent rate of return.

---

[29]Mr. Bishop did not adjust the value of the Cathead property upward, despite testifying and stating in his valuation report that he spoke with real estate agents who told him that property values in this area of Lake Michigan were stable with modest appreciation.

The estate's valuation of Clubside was based on assumptions unsupported by the record and was inconsistent in utilizing the value of the Cathead property. Conversely, Mr. Mitchell's analysis of the value of Clubside was thorough and supported by the evidence in the record. After reviewing all the evidence in the record, we agree with Mr. Mitchell's analysis and hold that the value of decedent's 27.5-interest in Clubside was $338,000 as of the valuation date.

### 3. Value of Stock in WLI

Respondent determined that the value of decedent's 770 shares of stock in WLI was $534,000, without regard to the guaranty provision. The estate determined that the value of decedent's 770 shares of stock in WLI was $316,740, without regard to the guaranty provision. Respondent raised the issue of the correct value of decedent's stock interest in WLI after the issuance of the notice of deficiency and agrees that he bears the burden of proof with respect to this issue. See Rule 142(a); Shea v. Commissioner, 112 T.C. 183, 191 (1999).

In the absence of arm's-length sales, the value of closely held stock is determined indirectly by weighing the corporation's net worth, prospective earning power, dividend-paying capacity, and other relevant factors. See Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982); sec. 20.2031-2(f), Estate Tax Regs. Additionally, the rights, restrictions, and

limitations of the various classes of stock must be considered in making valuation determinations. See Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990); Estate of Anderson v. Commissioner, T.C. Memo. 1988-511. The factors to be considered are those that an informed buyer and an informed seller would take into account. See Hamm v. Commissioner, 325 F.2d 934, 940 (8th Cir. 1963), affg. T.C. Memo. 1961-347.

Respondent relied on his appraiser, Mr. Mitchell, who valued WLI using a capitalized income analysis. The key components under Mr. Mitchell's capitalized income analysis were: (1) The determination of a reasonable level for net profits or net cash-flow; (2) an appropriate cost of capital; and (3) a reasonable rate of growth for the profit stream. Mr. Mitchell relied on relevant financial information of WLI for 1991, 1992, and 1993, to determine the value of the WLI stock.

Mr. Mitchell examined the revenues and expenses associated with WLI's operations for the years 1991, 1992, and 1993, and, after averaging the 3 years, he concluded that a reasonable level for net profits or net cash-flow, before tax, was $630,000. In order to reach this conclusion, Mr. Mitchell adjusted WLI's earnings for 1993 to reflect intercompany transactions with SCC, but he did not adjust WLI's earnings for 1991 or 1992 to account for intercompany transactions with SCC and affiliates.

In order to determine the cost of capital, Mr. Mitchell utilized the capital asset pricing model (CAPM).[30]  In his CAPM analysis, Mr. Mitchell determined a risk-free rate of return and added this to the product of beta[31] and a market risk premium. Mr. Mitchell then added an unsystematic risk premium to account for WLI's status as a small company.  Mr. Mitchell used a 7.5-percent risk-free rate of return based on the market yield of 30-year U.S. Treasury bonds as of the valuation date.  He determined the market risk premium using historical data published in Stocks, Bonds, Bills and Inflation by Ibbotson Associates.  On

---

[30]The capital asset pricing model (CAPM) is utilized to estimate a discount rate by adding the risk-free rate, an adjusted equity risk premium, and a specific risk or unsystematic risk premium.  The company's debt-free cash-flow is then multiplied by the discount rate to estimate the total return an investor would require compared to other investments.  See Estate of Klauss v. Commissioner, T.C. Memo. 2000-191 (citing Furman v. Commissioner, T.C. Memo. 1998-157).

[31]The application and utility of beta has been described in the following terms:

Beta, a measure of systematic risk, is a function of the relationship between the return on an individual security and the return on the market as a whole. Betas of public companies are frequently published, or can be calculated based on price and earnings data. Because the calculation of beta requires historical pricing data, beta cannot be calculated for stock in a closely held corporation.  The inability to calculate beta is a significant shortcoming in the use of CAPM to value a closely held corporation; this shortcoming is most accurately resolved by using the betas of comparable public companies. * * * [Furman v. Commissioner, T.C. Memo. 1998-157; citation and fn. ref. omitted.]

the basis of this information, Mr. Mitchell concluded that a market risk premium of 7.2 percent was appropriate.  This figure reflected the average annualized total return on equity investments in excess of the average annualized bond yield return on long-term government bonds over the period January 1926 to December 1993.  Mr. Mitchell estimated a beta of 1.0[32] because he could not obtain a reliable estimate of beta from comparable publicly traded stocks.  Mr. Mitchell also relied on data from Ibbotson Associates to determine the additional 5.3-percent premium for unsystematic risk to account for investment in a small company stock.  Application of the risk percentages and beta produced a cost of capital of 20 percent.  Mr. Mitchell felt that 3 percent reflected an appropriate rate of growth based on the inflation rate.  To determine the appropriate multiplier, Mr. Mitchell took 1 and divided it by the cost of capital minus the growth rate.  This yielded a capitalization factor of 1 divided by .17, or the equivalent of a multiplier of approximately 5.9. Applying the 5.9 multiplier to the equity cash-flow of $630,000, and dividing by the number of outstanding shares, 3,480, Mr. Mitchell concluded that the per share value of WLI was $1,068.

---

[32]Beta is calculated by comparing the movement in the returns of stock against the movement in returns of the stock market as a whole, which has a beta of 1.  A beta of 1 means that the company and the market are of equal risk; a beta greater than 1 means that the company is riskier than the market.  See Smith v. Commissioner, T.C. Memo. 1999-368.

Mr. Mitchell applied a 35-percent discount for lack of marketability, reducing the per share value of WLI to $694. Mr. Mitchell multiplied the per share value by the 770 shares owned by decedent and concluded that the approximate value of decedent's stock interest in WLI, as of August 18, 1994, was $534,000.

The use of CAPM is questionable when valuing small, closely held companies. This Court has recently observed:

> We do not believe that CAPM * * * [is] the proper
> analytical [tool] to value a small, closely held
> corporation with little possibility of going public.
> CAPM is a financial model intended to explain the
> behavior of publicly traded securities that has been
> subjected to empirical validation using only historical
> data of the two largest U.S. stock markets. * * *
> [Furman v. Commissioner, T.C. Memo. 1998-157.]

See also Estate of Klauss v. Commissioner, T.C. Memo. 2000-191 (rejecting use of CAPM to value small, closely held corporation with little possibility of going public); Estate of Maggos v. Commissioner, T.C. Memo. 2000-129 (same); Estate of Hendrickson v. Commissioner, T.C. Memo. 1999-278 (same). As of the valuation date, WLI was an S corporation with five shareholders owning all its outstanding stock. In his valuation of WLI, Mr. Mitchell states that WLI "would not have been expected to pursue a public offering of its stock." The only reference in the record to the possibility of WLI going public is found in Mr. Hoffman's testimony regarding the guaranty obligation, wherein he stated that the guaranty obligation, as it related to the potential

corporate distributions from SCC and WLI, was intended to provide for decedent in her later years because at sometime in the future the corporations presumably "would have gone public". On the basis of the evidence in the record, we believe WLI had little possibility of going public as of the valuation date. See Estate of Klauss v. Commissioner, supra.

In his report and testimony, Mr. Mitchell stated that a beta of 1.0 was chosen as an estimate because no reliable, comparable companies could be found. In his analysis, Mr. Mitchell augmented the market risk premium to account for investment in a small company stock. Mr. Mitchell testified that such an increased risk premium is the same as applying a beta of 1.74, or a beta indicating a higher level of risk than market average, and that the risk premium was intended to compensate for the inability to estimate the beta of WLI.[33] Mr. Mitchell's report states that 5.3 percent is equivalent to the premium for investing in small company stocks as calculated by Ibbotson Associates, but Mr. Mitchell did not explain why such a figure is appropriate for WLI specifically. Mr. Mitchell assumed that a beta of 1.0 was an appropriate estimate to use in valuing the WLI stock under CAPM because he could not find any comparable publicly traded stocks. As we noted earlier, the failure to

---

[33]Alternatively, Mr. Mitchell noted that the 5.3-percent risk premium could be viewed as increasing the market risk premium to 12.5 percent.

calculate beta is a significant shortcoming in the use of the CAPM to value a closely held corporation. See Furman v. Commissioner, supra. Mr. Mitchell did not provide support for the amount of the additional risk premium, other than citing the source of the amount used, and he simply assumed a beta equal to market risk. In the instant case, respondent has failed to provide the evidence necessary for us to determine whether use of CAPM was appropriate, and whether the figures used in his calculations were reliable. See, e.g., Estate of Klauss v. Commissioner, supra; Estate of Maggos v. Commissioner, supra; Estate of Hendrickson v. Commissioner, supra; Furman v. Commissioner, supra.

Respondent's valuation determination was also unclear in another aspect. Mr. Mitchell subtracted intercompany profits only for 1993 when determining WLI's earnings.[34] Mr. Mitchell stated that he was being conservative with respect to the net earnings of WLI for 1993 and that is why he subtracted the intercompany profits. Mr. Mitchell explained that it was appropriate to subtract the intercompany profits for 1993 because, for financial reporting purposes, the activities of WLI were combined with other entities having common ownership while

---

[34]Mr. Mitchell testified that he did not know for a fact that the approximately $250,000 in intercompany profits should be subtracted from WLI's earnings but that he went ahead and did it to be conservative.

WLI's activities were reported individually for 1991 and 1992 for financial purposes. Mr. Mitchell testified that he did not adjust WLI's net earnings for intercompany profits for 1991 and 1992, despite acknowledging that there were intercompany profits for those years.[35] Mr. Mitchell explained that he used the earnings figures for 1991 and 1992 that were in the audit of WLI and that this information is what a shareholder would rely on. He testified that intercompany profits from a related entity should not be eliminated from earnings unless it is assumed that such profits would not continue in the future.

Mr. Mitchell agreed that WLI had intercompany profits for 1991, 1992, and 1993, from transactions with SCC and affiliates and that it is possible that such transactions could result in the undervaluation of SCC. If SCC is undervalued as a result of the transactions with WLI, then it is possible that the intercompany transactions increasing the profits of WLI could result in the overvaluation of WLI. After reviewing all the evidence in the record, we find that respondent has not established that the intercompany profits did not distort the value of WLI for 1991, 1992, and 1993, and we are not willing to rely solely on Mr. Mitchell's assumption that any intercompany

---

[35]In his valuation report, Mr. Mitchell identified sales of lots and bulk parcels of lands made by WLI to SCC and affiliates. According to Mr. Mitchell's report, the difference between the sales prices and the costs of the properties was $665,247 for 1991 and $788,042 for 1992.

profits earned by WLI for 1991 and 1992 did not need to be accounted for in his valuation analysis.  Because respondent has failed to establish a fair market value above the amount reported on the estate tax return, we hold for the estate on this issue.

To reflect the foregoing,

Decision will be entered

under Rule 155.